# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Sapphire Development, LLC &
Hudson City Savings Bank,

     Appellants,

     v.

Robert J. McKay,

     Appellee.

No. 3:15-cv-1570 (MPS)
No. 3:15-cv-1097 (MPS)

## OPINION AND ORDER

One business day before the start of trial in a state court lawsuit that sought to void the transfer to it of real estate, Sapphire Development, LLC ("Sapphire"), filed for bankruptcy under Chapter 11 of the Bankruptcy Code, effectively staying the state court action. Crying foul, the plaintiff in the state court action, Robert McKay, moved to dismiss the bankruptcy for "cause" under 11 U.S.C. § 1112(b)(1), arguing that it was filed in bad faith. After holding evidentiary hearings, the bankruptcy court agreed, and dismissed the case. Sapphire and Hudson City Savings Bank ("Hudson City"), a secured creditor, appeal the dismissal to this Court.[1] Because the findings of fact underlying the bankruptcy court's dismissal were not clearly erroneous and support the conclusion that there was "cause" to dismiss, I affirm.

Bankruptcy is an equitable remedy. When it is invoked to accomplish ends inconsistent with its equitable purposes, the bankruptcy court must dismiss the proceeding. Sapphire had no need to file for bankruptcy to reorganize or secure a "fresh start" as a business because it conducted no business. As the bankruptcy court found, it has had no employees for almost a decade, has failed to pay taxes on the property to which it has title, has received income only from related entities, and has done nothing of significance in recent years other than hold the

---

[1] Although the parties' appeals generated separate case dockets in this Court (Case Nos. 15-cv-1570 (MPS) (Sapphire), 15-cv-1097 (MPS) (Hudson City)), I address both appellants' arguments in a single opinion, which will be docketed in each case.

property on which its principal resides.  Nor was there a material need to protect creditors from a disorderly dismemberment of the debtor's assets.  As the bankruptcy court also found, Sapphire has only one asset (the real estate on which its principal has lived for thirty years), none of the secured creditors was threatening to foreclose on that asset, and the claims of the unsecured creditors were *de minimis*.

Sapphire and Hudson City have failed to show that any of the bankruptcy court's findings was clearly erroneous, which leaves only one explanation for Sapphire's bankruptcy filing: a trial in the State Court Action was about to begin in which the plaintiff sought a finding that Sapphire's principal, rather than Sapphire itself, actually owned the real estate.  And despite its stated intention to "reorganize" by subdividing the property, Sapphire did not, after filing under Chapter 11, file a subdivision plan with the Town Planning and Zoning Commission.  Nor did it present evidence the bankruptcy court found credible that subdividing the property would enhance its value.  In short, the bankruptcy court's dismissal for "cause" was supported by evidence that Sapphire's bankruptcy filing was a tactical litigation maneuver that would further no purpose of the bankruptcy laws.  Further, Sapphire's argument that dismissal will prejudice creditors does not withstand scrutiny, because the only secured creditor that has a stake in maintaining the bankruptcy will have the same opportunity to contest the fraudulent transfer claims in state court that it would have in bankruptcy court.  The bankruptcy court's decision is therefore AFFIRMED.

This opinion supersedes the short-form order that was issued on January 25, 2016.

## Background

Stuart Longman is the trustee of the Gayla Longman Family Irrevocable Trust (the "Trust"), which is the sole owner of Sapphire.  Longman is also the operating manager of

Sapphire; Gayla Longman is his wife.  Sapphire, a limited liability company formed in 2000, owns – as its sole asset – a 25-acre property in Ridgefield, Connecticut (the "Property"), at which the Longmans have resided for over thirty years.  Longman purchased the Property in 1985, and the Property has since been transferred between Sapphire, Longman, Longman's wife, and several entities controlled by Longman.  During this period, Hudson City, J.P. Morgan Chase Bank, and the Savings Bank of Danbury lent money to Sapphire and took mortgages on the Property.

In 1996, a New York state court awarded Robert McKay a $3.96 million judgment against Longman resulting from a finding of fraud.  During the same year, McKay filed two certificates of foreign judgment against Longman in Connecticut Superior Court.  In 2010, McKay filed suit in Connecticut Superior Court against Longman, Sapphire, several other entities controlled by Longman, Hudson City, and the Savings Bank of Danbury.[2]  *McKay v. Longman, et al.*, FST-CV-10-6007056-S ("State Court Action").  In the State Court Action, McKay seeks a constructive trust on the Property, a finding that Longman fraudulently transferred the Property to Sapphire, and a finding that Sapphire's corporate veil should be pierced.  On January 11, 2013, the Friday before the Monday on which trial of the State Court Action was to begin, and following almost three years of discovery, Sapphire commenced this bankruptcy, which led the judge presiding over the State Court Action to suspend the proceedings pending developments in the bankruptcy court.  In the portion of its disclosure statement explaining why it filed for bankruptcy, Sapphire stated:

> [T]his bankruptcy filing has been precipitated by the meritless, yet relentless, pre-petition litigation initiated by McKay against the Debtor.  McKay's pre-petition litigation has placed a cloud on the title and marketability of the Property, thereby depriving the Debtor's legitimate creditors of a source of repayment on their claims.  Indeed, the entire purpose of the State Court Action is McKay's desire,

---

[2] McKay has since withdrawn his claims against the Savings Bank of Danbury.

albeit as discussed above misplaced, to transmogrify his claim against Longman individually into a claim against the Debtor's estate that trumps all other creditor claims. The State Court Action also calls into question the priority of Hudson City's secured claims. Accordingly, this bankruptcy case was commenced to effectuate the twin goals of bankruptcy: To ensure that all of the Debtor's creditors are paid on an equitable basis, through the subdivision and sale of a portion of the Property, and to afford itself a fresh-start.

(Bankr. ECF No. 135, at 20.)[3]  Soon after Sapphire's filing, McKay moved in the bankruptcy court for dismissal of the case, relief from the automatic stay, and abstention.

Before the bankruptcy court issued a decision on McKay's motions, Sapphire filed an adversary complaint seeking a declaration "that McKay does not possess a bona fide claim against Sapphire, and therefore, is not entitled to relief against the Debtor for any purpose, is not entitled to vote in or otherwise recover against the Debtor or its assets in Plaintiff's Chapter 11 Bankruptcy case and[]otherwise[]lacks standing in this Case . . ." (*In re Sapphire Dev., LLC*, Adv. Pro. 13-05024 (Bankr. Conn.), ECF No. 1, at 4.)  No action was taken in the adversary proceeding.

On May 10, 2013, Sapphire submitted a Disclosure Statement (Bankr. ECF No. 135) and Chapter 11 Reorganization Plan (Bankr. ECF No. 136). The bankruptcy court approved the Disclosure Statement on May 15, 2013 (Bankr. ECF No. 145), but did not act upon the Reorganization Plan. The Summary of Schedules lists four secured creditors: Hudson City ($2,356,614.00), J.P. Morgan Chase Bank ($500,000.00), Savings Bank of Danbury ($3,022,763.00), and the Town of Ridgefield Tax Collector ($155,572.32). (Bankr. ECF No. 36, at 6, as amended by Bankr. ECF Nos. 73, 75, 84, 132.)  It lists six unsecured creditors, including Bethel Overhead Doors, LLC ($675.00), Gault Mason Supply ($8,008.00), Mark Stern &

---

[3] Entries in the bankruptcy docket (Case No. 13-50043) will be cited as "Bankr. ECF No. __," entries in the district court docket corresponding to Sapphire's appeal (Case No. 15-cv-1570 (MPS)) will be cited as "Sapphire ECF No. __," and entries in the district court docket corresponding to Hudson City's appeal (Case No. 15-cv-1097 (MPS)) will be cited as "Hudson ECF No. __."

Associates, LLC ($10,000.00), O&G Industries ($6,715.00), and Sloss Electric, LLC ($2,000.00).  (Bankr. ECF No. 36, at 9-10, as amended by Bankr. ECF Nos. 73, 75, 84, 132.) Longman is listed as a co-debtor for these unsecured claims.  (*Id.* at 12.)  McKay is listed as an unsecured creditor, but the value of his claim is listed as $0.00.  (*Id.* at 10.)

### A. <u>Motion to Abstain</u>

The bankruptcy court held a three-day evidentiary hearing on McKay's abstention motion.  McKay, Longman, and Christopher Mahler, a senior vice president and mortgage officer at Hudson City, testified at the hearing.  During his testimony, McKay admitted that some of Sapphire's creditors were not parties in the State Court Action.  (June 20, 2013 Transcript, Bankr. ECF No. 199, at 86.)  He stated that he was no longer seeking to "set aside" the Savings Bank of Danbury's mortgage (*id.* at 109), and that neither the Savings Bank of Danbury's nor J.P. Morgan Chase's mortgage would be harmed if he prevailed in the State Court Action (*id.* at 116).[4]  McKay admitted that the Property previously had been subdivided and sold successfully several times.  (*Id.* at 90–91.)  When asked why he preferred to litigate his claims in state court, McKay stated that he was seeking to "trump" Hudson City's interest in the Property.  (*Id.* at 118.)

Mahler testified that he was unaware of McKay's judgment against Longman when he approved the mortgage in 2007.  (July 24, 2013 Transcript, Bankr. ECF No. 217, at 11–12.)  He also testified that Longman falsely told Hudson City that no judgments were pending against him

---

[4] J.P. Morgan's mortgage is from Longman individually.  (*See* Open-End Mortgage, Sapphire's Abstention Hearing Ex. 19.)  As McKay has pointed out, J.P. Morgan's interests are thus better served if McKay prevails in the State Court Action – which may explain why J.P. Morgan has not resisted McKay's efforts to end the bankruptcy proceeding.  (Case No. 3:13-cv-01680-MPS, ECF No. 26, at 14.)  The Savings Bank of Danbury, too, has apparently concluded that its interests coincide with McKay's.  It does not oppose dismissal of the bankruptcy case, and actively supported the bankruptcy court's earlier order of abstention.  (*See* Bankr. ECF No. 208, at 2 (Savings Bank of Danbury indicating its support of McKay's motion to abstain before the bankruptcy court); Case No. 3:13-cv-01680-MPS, ECF No. 26, at 14 (Savings Bank of Danbury indicating its support of affirmance of the bankruptcy court's order of abstention).)

when he submitted the mortgage documents.  (*Id.* at 25.)  Mahler was unaware when Hudson City accepted the mortgage that, within a matter of minutes on October 31, 2007, the Stewart Longman Family Trust transferred the Property to Sapphire, Sapphire issued the mortgage to Hudson City, and then Sapphire transferred the Property to Longman personally.  (*Id.* at 16–19; McKay's Abstention Hearing Exs. 15, 16, 18.)

During his testimony, Longman stated that upon purchasing the Property in 1985, he subdivided it into four parcels, and then later re-subdivided and sold those parcels, resulting in proceeds of approximately $4 million.  (*Id.* at 45.)  He did not specify the dates of those sales. He also recounted the lengthy series of transfers involving the Property since the initial 1985 acquisition: to Longman's wife in 1995, to Highland Connecticut Investment, LLC, in 2002, to Sapphire in 2006, to the Stewart Longman Family Trust soon after, to Sapphire in October 2007, to Longman the same day, and then back to Sapphire in December 2007.  (*Id.* at 45–51.) Longman testified that he has lived on the Property since 1985 without interruption (*id.* at 70), that Sapphire has had no employees since 2007 and has not filed any tax returns since 2006 (*id.* at 112),[5] and that the only funds Sapphire received in the 12 to 18 months prior to the bankruptcy were from entities owned or controlled by Longman: the Trust, Penguin Financial, and Luri Investments[6] (*id.* at 113–14).  Longman also testified that the Town of Ridgefield had imposed a tax lien "for pre-filing taxes" in the amount of $100,000.  (*Id.* at 61.)

---

[5] Longman stated that Sapphire did not submit tax returns because it is a single-member entity whose income was reported fully on its owner's tax returns.  (April 16, 2015 Transcript, Bankr. ECF No. 313, at 14.)

[6] Penguin and Luri are both operated by Longman and owned by the Trust.  (*Id.* at 65, 115.)  In an earlier hearing, Sapphire's attorney conceded that Longman was simply transferring funds between his entities:
    **The Court**: And are those family entities controlled by Mr. Longman?
    **Mr. Plotkin**: Yes.
    **The Court**: They're his.  He lends himself some money.
    **Mr. Plotkin**: I mean --
    **The Court**: I mean he transfers money to himself.
    **Mr. Plotkin**: Right . . .

The bankruptcy court granted McKay's motion for abstention under 11 U.S.C. § 305(a)(1).  (Bankr. ECF No. 222.)  In considering the "purpose for which bankruptcy jurisdiction was sought" – a factor relevant to whether abstention under Section 305(a)(1) is appropriate – the bankruptcy court made the following factual findings:

> [Sapphire] is an artificial entity whose only purpose is to hold title to the Property, its only asset, which is not income producing.  For the last three years (2011, 2012, and 2013) [Sapphire] has received contributions from the other related entities.  It has not filed federal income tax returns for several years.  The debtor has no employees and conducts no business.  Without considering McKay's [New York j]udgment, [Sapphire] has approximately $27,000 in general unsecured claims, and for each of those unsecured creditors, Longman is identified as a co-debtor with [Sapphire].  Moreover, [Sapphire] has been making monthly mortgage payments to the first mortgagee, Hudson, and there are no foreclosure actions pending against it.

> Therefore, it is open to considerable doubt whether the debtor needs to reorganize.  Indeed, despite the debtor's self-serving proclamation that "this bankruptcy case was commenced to effectuate the twin goals of bankruptcy: To ensure that all of [Sapphire's] creditors are paid on an equitable basis, through the subdivision and sale of a portion of the Property, and to afford itself a fresh-start," it is reasonable to question that representation when there is no dispute that secured creditors are being paid and there is a nominal pool of general unsecured creditors for whom Longman is a co-debtor.  Such suspicion is buttressed by [Sapphire's] assertion that its "bankruptcy filing has been precipitated by the meritless, yet relentless, pre-petition litigation initiated by McKay against [Sapphire]," notwithstanding that fact that the [New York j]udgment was base[d] on Longman's "gross, wanton, and willful," conduct.

> This Court has serious concerns that by filing for bankruptcy protection, the debtor is not just seeking to stay the State Court Action, but, by claiming McKay is not a creditor or even a party-in-interest, is also seeking to eradicate McKay's ability to have his day in court, either here or in state court.  Put another way, distilled to its pungent essence, [Sapphire] and Longman are attempting to lock McKay out of this court and the state court in an effort to avoid paying a judgment Longman owes to McKay for Longman's affirmative fraud.  Against that backdrop, Longman points his finger at McKay in this court of equity?  The word *chutzpah* comes to mind.  McKay is entitled to his day in court, but, for the reasons stated above, it is not this court.

(Bankr. ECF No. 96, at 26.)

(*Id.* at 6–8 (citations omitted).)  Sapphire appealed.  This Court reversed and remanded, holding

that the bankruptcy court's decision to abstain was premised on an erroneous view of Section

305(a)(1), which required that abstention be in the best interests of the "creditors and the debtor."

This Court found that because the debtor and one secured creditor (Hudson City) had an interest

in maintaining the bankruptcy and because the unsecured creditors were not parties in the State

Court Action, the bankruptcy court erred in abstaining under a provision that permitted it only if

it was in the best interests of *all* creditors and the debtor.  *Sapphire Dev.*, 523 B.R. at 8, 10.  This

Court noted, however, that the bankruptcy court's above-quoted findings regarding Sapphire's

intent in filing for bankruptcy were "supported by the evidence" and "would likely support

granting either the motion to dismiss or the motion for relief from the automatic stay."  *Id.* at 12.

This Court directed that, following remand, should the bankruptcy court find that dismissal or

relief from the automatic stay was appropriate, any appeal be accompanied by a statement that it

should be transferred to the undersigned.

### B.  <u>Motion to Dismiss</u>

After remand, the bankruptcy court addressed McKay's motion to dismiss.  Sapphire and

Hudson City opposed the motion.  The bankruptcy court informed the parties that in deciding the

motion to dismiss, it would consider all evidence presented during the abstention hearing, as well

as evidence to be presented at an additional evidentiary hearing on the motion to dismiss.  No

party objected.   At the latter hearing, McKay called Betty Brosius, director of planning for the

Town of Ridgefield, who testified that no formal application for subdivision with respect to the

Property had been submitted to the Town Planning and Zoning Commission (the

"Commission").  (April 14, 2015 Transcript, Bankr. ECF No. 312, at 18.)  Brosius testified that

the Commission had reviewed only a "presubmission concept" of the proposed subdivision

8

informally.  (*Id.* at 19–20.)  Sapphire submitted "approved" minutes of a Commission meeting

stating that, "[a]fter a brief presentation by Mr. Longman who stated that his proposal met the

regulations and a short history of the property by Planner Brosius, Commission consensus was to

favor the pre-submission concept of a proposed subdivision."  (*Id.*; Sapphire's Mtn. to Dismiss

Hearing Ex. 1.)

McKay then called Longman to testify.  Longman testified that Sapphire's only income

since January 2014 had been from the Trust.  (April 14, 2015 Transcript at 32–33.)[7]  Longman

testified that Sapphire's income from August 2014 to February 2015 was less than $2,000 a

month.  (*Id.* at 53–54.)  When asked about a $100,000 arrearage on Hudson City's mortgage,

Longman claimed that he had recently made a payment to Hudson City.  (*Id.* at 54.)  He could

not, however, provide documentation of the payment.  (*Id.* at 54–55.)  On the second hearing

date, April 16, 2015, Hudson City was unable to confirm such payment.  (April 16, 2015

Transcript, ECF No. 313, at 36–41.)  Longman also admitted signing operating reports stating

that the source of Sapphire's recent income was Lurie Investments when, in fact, the source was

the Trust.  (April 14, 2015 Transcript at 58–59.)  He attributed this misstatement to the fact that

his excel spreadsheets have "tiny print."  (*Id.* at 59.)

When asked why Sapphire filed for bankruptcy, Longman stated that the State Court

Action did not include two major Sapphire creditors, and as a result, the Property could not be

monetized in a way that treated all creditors fairly.  (April 16, 2015 Transcript at 9.)  Longman

also testified that the Property was recently appraised at $5.5 million.  (*Id.* at 16–17.)  When

asked why Sapphire had not submitted a formal subdivision plan to the Commission, Longman

stated that he was under the impression that he could not make any such filings on behalf of

---

[7] Longman's testimony was contradictory on this point.  He initially stated that Gayla Longman, his wife, made a contribution to Sapphire during this time, but when asked if "every deposit into Sapphire's account came from the Gayla Longman Trust," he answered yes.  (*Id.* at 33.)

Sapphire without the bankruptcy court's permission.  (April 14, 2015 Transcript at 60.)  He stated that his informal presentation to the Commission resulted in no negative comments, which he believed meant there were "no discretionary obstacles" to the Commission's approval.  (April 16, 2015 Transcript at 18.)  Longman testified that the entity listed as the funder of the reorganization plan, Penguin, was still willing to proceed with the plan.  (*Id.* at 21–23.)  A "balance sheet" submitted on behalf of Penguin indicates that it holds $16,563,583 in total assets and has zero liabilities.[8]  (Bankr. ECF No. 135-15 ("Penguin Balance Sheet").)

Longman did not dispute that the appraiser he cited in his testimony was not a member of the Appraisal Institute ("MAI"),[9] and that the appraiser had not provided a comparison value for the property as-is, i.e., without subdivision.  (April 16, 2015 Transcript at 28–29.)  He also conceded that one of the previous appraisals by MAI appraisers opined that the value of the Property without subdivision would be "almost exactly the same as the value subdivided."  (*Id.* at 29–30.)[10]  That appraisal listed the value of the Property at $4.5 million unsubdivided, and at $4.6 million subdivided.  (Bankr. ECF No. 135, at 15.)  Longman also conceded that together,

---

[8] McKay claims that the Plan Funder Balance Sheet is "ludicrously incomplete and unauthenticated."  (McKay Br. 14.)  Yet he provides no reason why the information listed on the balance sheet is legally inadequate.  Given that the bankruptcy court approved the Disclosure Statement, which requires a finding that the statement "contain[s] information sufficient to permit a typical member of a class to make an informed investment judgment concerning the plan," 7 Collier on Bankruptcy ¶ 1100.09(2)(c) (citing 11 U.S.C. § 1125), and that McKay does not challenge that approval, I find no basis to reject the Plan Funder Balance Sheet as evidence of Penguin Financial's capacity to fund the reorganization plan.

[9] The Second Circuit has recognized,

> The "MAI" designation indicates that an appraiser has, *inter alia*, "an undergraduate degree from a four-year accredited educational institution," at least "6,000 hours of experience, including 3,000 hours of specialized appraisal experience," and has passed both "a four-module, two-day comprehensive examination," as well as eleven other exams "that reflect 380 hours of classroom instruction and that test the appraiser's knowledge of basic and advanced appraisal principles, procedures and applications; report writing; valuation analysis and standards of professional practice."

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 n.8 (2d Cir. 2005) (citation omitted).

[10] The record indicates that a second MAI appraiser conducted another appraisal of the Property, but the parties have pointed to nothing in the record showing the outcome of that appraisal.

the Longman-controlled, single-member entities (Emerald, Sapphire, and Lurie) had a total negative income of approximately $1.5 million per year during the previous three years (*id.* at 32), and that Sapphire owed the Town of Ridgefield $281,849.61 in delinquent taxes on the Property (*id.* at 34–35; McKay's Mtn. to Dismiss Hearing Ex. F).  Finally, he admitted that another Longman-controlled entity, Emerald, had recently "filed a petition in bankruptcy in the Southern District of New York just before a foreclosure proceeding was about to be tried."  (*Id.* at 32.)

On June 26, 2015, the bankruptcy court granted McKay's motion to dismiss.  (Bankr. ECF No. 317 ("Bankr. Decision").)  The court first considered the factors relevant to determining whether the debtor filed the bankruptcy case in bad faith.  Considering the eight factors set forth in *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997), the bankruptcy court found that Sapphire filed the case in bad faith, amounting to "cause" for dismissal under 11 U.S.C. § 1112(b)(1).[11]  (Bankr. Decision, at 7–10.)  The bankruptcy court then determined that dismissal, as opposed to conversion, was in the best interests of the creditors and the estate.  (*Id.* at 10–12.)  Finally, the bankruptcy court concluded that neither Sapphire nor Hudson City satisfied its burden of showing that the "exception" set forth in 11 U.S.C. § 1112(b)(2) applied.  (*Id.* at 12–13.)  Sapphire and Hudson City appealed the bankruptcy court's decision dismissing the case.

## Discussion

On appeal, Sapphire and Hudson City argue that: (1) the finding that Sapphire filed for bankruptcy in bad faith was clearly erroneous, (2) the bankruptcy court failed to address whether Sapphire's reorganization was objectively futile, and even if it did, any finding of objective

---

[11] I elucidate the bankruptcy court's reasoning on this point further in the Discussion section below.

futility was clearly erroneous, and (3) the finding that this case did not fall under the 11 U.S.C. § 1112(b)(2) was error.  I disagree and AFFIRM the bankruptcy court's decision.

### A.  <u>Standard of Review</u>

A district court reviews a bankruptcy court's legal determinations *de novo* and its factual findings for clear error.  *In re Robert Plan. Corp.*, 777 F.3d 594, 596 (2d Cir. 2015).[12]  A determination that a bankruptcy was filed in bad faith is a factual finding reviewed for clear error.  *See C-TC 9th Ave. P'Ship*, 113 F.3d at 1312 n.6.  "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *New York Prof'l and Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (citation and internal quotation marks omitted). I review *de novo* the bankruptcy court's decision whether to apply the exception to dismissal or conversion set forth in 11 U.S.C. § 1112(b)(2).  *See, e.g.*, *Squires Motel, LLC v. Gance*, 426 B.R. 29, 34 (N.D.N.Y. 2010).

### B.   <u>Equitable Purposes of Bankruptcy and the Good Faith Requirement</u>

"Bankruptcy is an equitable remedy whereby a debtor is clothed with the protection of an automatic stay, preventing his creditors from acting against him for a period of time, in order to facilitate rehabilitation or reorganization of his finances and to promote a 'fresh start' . . ."  *In re 9281 Shore Road Owners Corp.*, 187 B.R. 837, 848 (E.D.N.Y. 1995) (internal quotation marks and citation omitted).  Another purpose of bankruptcy is to protect creditors and avoid a disorderly dismemberment of the debtor's estate.  *Young v. Higbee Co.,* 324 U.S. 204, 210 (1945) ("[H]istorically[,] one of the prime purposes of the bankruptcy law has been to bring

---

[12] While the December 2014 amendments to the Federal Rules of Bankruptcy Procedure removed the previous Rule 8013 language setting out expressly the appellate standards of review, the amendments did not alter substantively those standards.  *See* 10 Alan N. Resnick & Henry J. Summers, Collier on Bankruptcy ¶ 8014.02 (16th ed.); *Robert Plan Corp.*, 777 F.3d at 598 (maintaining the previously stated standards of review after the 2014 amendments).

about a ratable distribution among creditors of a bankrupt's assets; to protect the creditors from one another."  (footnote omitted)); *Mann v. Chase Manhattan Mortg. Corp.*, 316 F.3d 1, 4 (1st Cir. 2003) (noting that automatic stay provision "is designed to forfend against the disorderly, piecemeal dismemberment of the debtor's estate outside the bankruptcy proceedings.").  With regard to Chapter 11 in particular, "the purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by provided them with breathing space in which to return to a viable state."  *C-TC 9th Ave. P'ship*, 113 F.3d at 1310 (citation and alteration omitted); *see also id.* at 1308 ("[T]he underlying purpose of Chapter 11 is to rehabilitate the debtor and offer a fresh start." (citation and alteration omitted)).

These purposes inform judicial interpretation of the bankruptcy code.  *Local Loan Co. v. Hunt*, 292 U.S. 234, 245 (1934) ("One of the primary purposes of the Bankruptcy Act is to relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortune. . . . The various provisions of the bankruptcy act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act."); *In re Comcoach Corp.*, 698 F.2d 571, 573 (2d Cir. 1983) ("When interpreting the meaning of Code terms . . ., we are governed by the Code's purposes.").

The first provision of the code at issue in this case is 11 U.S.C. §1112(b)(1), which provides, as follows:

> [T]he court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).  "In general terms, the cause requirement of section 1112(b) applies at various stages in the case to test whether the benefits of reorganization are likely to be achieved

within a reasonable amount of time and in a manner that is consistent with the requirements and restrictions of the Code." 7 Collier on Bankruptcy ¶ 1112.07(1); *see In re Layo*, 460 F.3d 289, 293 (2d Cir. 2006) (describing Collier on Bankruptcy as "the leading bankruptcy treatise"). Section 1112(b)(4) sets forth a non-exhaustive list of causes warranting dismissal or conversion, such as "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," and "gross mismanagement of the estate." *See In re GEL, LLC*, 495 B.R. 240, 246 (E.D.N.Y. 2012) ("The grounds set forth in § 1112(b) for dismissal or conversion are illustrative, not exhaustive." (citation and internal quotation marks omitted)). Once cause is established, the bankruptcy court has discretion in choosing between dismissal and conversion, "whichever is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1).

Although it is not listed in the statute, several courts, including those within the Second Circuit, have treated the filing of bankruptcy in "bad faith" as "cause" for dismissal or conversion under Section 1112(b)(1). *See, e.g.*, *In re Gucci*, 174 B.R. 401, 409 (Bankr. S.D.N.Y. 1994) ("Although bad faith is not included as one of the ten listed categories under 11 U.S.C. § 1112(b)[4], it has been established that a lack of good faith in filing a chapter 11 petition may constitute cause under 11 U.S.C. § 1112(b)." (citations omitted)). "Good faith" – whether tied to particular statutory terms or simply inherent in the equitable nature of bankruptcy proceedings – has long been a threshold requirement for invoking the protection of the bankruptcy laws. *9281 Shore Road Owners*, 187 B.R. at 848 ("Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings.") (citation and internal quotation marks omitted)).

Unlike the grounds for "cause" enumerated in Section 1112(b)(4), bad faith focuses on the filer's subjective intent:

> In contrast to testing the debtor's prospect of reorganization, the good faith standard focuses directly on the subjective intentions of the debtor and proper use of the bankruptcy system as a general system of equity and is designed to prevent abuse of the bankruptcy process, or the rights of others, involv[ing] conduct or situations only peripherally related to the economic interplay between the debtor and the creditor community.

7 Collier on Bankruptcy ¶ 1112.07(1) (internal quotation marks and footnote omitted). Bad faith is a widely recognized ground for dismissal or conversion under Section 1112(b). *Id.*

The Second Circuit has recognized bad faith as "cause" for dismissal under Section 1112(b). *See C-TC 9th Ave. P'ship*, 113 F.3d at 1310. It has been less explicit, however, as to how courts should determine bad faith. Sapphire contends that Second Circuit precedent requires a two-part showing before a bankruptcy court may dismiss a case for bad faith: (1) that the debtor does not actually intend to reorganize under the Bankruptcy Code (a subjective analysis), and (2) that there is no reasonable possibility that the debtor will successfully emerge from bankruptcy (an objective analysis). As explained further below, the Court of Appeals for the Second Circuit has not clearly adopted this test, although several bankruptcy and district courts within the Second Circuit have. Whether the test is purely subjective or whether it includes an independent objective component focused on the prospects of reorganization, however, I conclude that the bankruptcy court properly determined that Sapphire's bankruptcy fails the bad faith test.

**1. <u>Bad Faith Test</u>**

The federal circuits disagree on the question of whether, to dismiss a case for bad faith filing under Section 1112(b), a court must find objective futility of reorganization. The Fourth Circuit, for example, requires a finding of both subjective bad faith *and* objective futility:

15

> [E]ven if subjective bad faith in filing could properly be found, dismissal is not warranted if futility cannot also be found.  This, we think, is the only sufficiently stringent test of justification for threshold denials of Chapter 11 relief.  Such a test obviously contemplates that it is better to risk proceeding with a wrongly motivated invocation of Chapter 11 protections whose futility is not immediately manifest than to risk cutting off even a remote chance that a reorganization so motivated might nevertheless yield a successful rehabilitation. . . . We believe that such a stringent test is necessary to accommodate the various and conflicting interests of debtors, creditors, and the courts that are at stake in deciding whether to deny threshold access to Chapter 11 proceedings for want of good faith filing.

*Carolin Corp. v. Miller*, 886 F.2d 693, 701 (4th Cir. 1989). In contrast, the Eleventh Circuit has held that a finding of subjective bad faith alone is sufficient to dismiss a bankruptcy case:

> Because the bankruptcy court found that a bad faith filing had occurred, it properly did not change the consequences of that finding simply because of the debtor's possible equity in the property or potential for successful reorganization. We reject the debtor's argument that the bankruptcy court cannot ever dismiss a case for bad faith if there is equity in the property because the presence of equity indicates the potential for a successful reorganization. . . . The possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith.

*In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir. 1988).  I find the Eleventh Circuit's approach more persuasive.  As Collier points out, because the "absence of a reasonable likelihood of rehabilitation" is already an enumerated cause in Section 1112(b)(4)(A), "adding . . . the element of objective futility . . . may effectively negate bad faith filing as a basis for dismissal or conversion of the case."  7 Collier on Bankruptcy ¶ 1112.07(6)(a).  And eliminating subjective bad faith as a sufficient basis for dismissal would run counter to the equitable nature of bankruptcy proceedings.  *See In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) ("[A] good faith standard protests the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those debtors and creditors with 'clean hands.' ").  If one party has acted in bad faith by invoking the protection of the bankruptcy laws for reasons inconsistent with the purposes of those laws, the bankruptcy court should not be

16

forced to retain jurisdiction simply because one of the factors in the non-exhaustive list in the statute – "the absence of a reasonable likelihood of rehabilitation" – does not apply.[13]

Unlike Sapphire, I do not read the Second Circuit's precedents in this area to take a different view, i.e., to bar dismissal absent a finding of *both* subjective bad faith *and* objective futility.  Sapphire cites *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222 (2d Cir. 1991), which reviewed a bankruptcy court's imposition of sanctions under Fed. R. Bankr. P. 9011 against an attorney for the filing of a frivolous bankruptcy case.  In *Cohoes*, the court stated, "[a] petition for Chapter 11 bankruptcy may be deemed frivolous if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings."  *Id.* at 227 (citations omitted).  This conjunctive language, however, pertains to Rule 9011 sanctions for frivolous filings, not to dismissal for "cause" under Section 1112(b).  Later in the opinion, the *Cohoes* court specifically described the good faith requirement for bankruptcy filings, without reference to "reasonable probability" or any other objective component: "[B]ecause bankruptcy filings must be made in good faith, an entity may not file a petition for reorganization which is solely designed to attack a judgment collaterally – *the debtor must have some intention of reorganizing*."  *Id.* at 228 (emphasis added).  Subsequently, in *C-TC 9th Ave. P'ship*, the Second Circuit, citing *Cohoes*, described "reasonable probability" and "intention to reorganize" as independent requirements

---

[13] I do not intend to suggest that, even in a bad faith analysis, the debtor's prospects of successful reorganization are irrelevant.  To the contrary, the objectively assessed chances of the debtor's emerging from bankruptcy may provide one indication of the debtor's subjective intent in filing for bankruptcy protection.  Even the Fourth Circuit in *Carolin Corp.* acknowledged this:

> We do not rule out the possibility that in a given case proof of the objective futility of a proposed reorganization might be so overwhelming that it would support a parallel finding of subjective bad faith despite the lack of any other evidence more directly probative of the petitioner's motive.  In some situations futility may be so obvious that the only rational inference to be drawn is that petitioner had to be aware of it, hence not to have intended to reorganize but only to delay or harass.

886 F.2d at 701 n.3.

that *the debtor* must meet to invoke the bankruptcy laws – and thus, at least implicitly, as

independent bases to dismiss a petition:

> When it is clear that, from the date of filing, the debtor has no reasonable
> probability of emerging from the bankruptcy proceedings and no realistic chance
> of reorganizing, then the Chapter 11 petition may be frivolous.  *Further*, an entity
> may not file a petition for reorganization which is solely designed to attack a
> judgment collaterally–the debtor must have some intention of reorganizing.

113 F.3d at 1310 (emphasis added) (citation and internal quotation marks omitted).  It is at least

permissible to read these cases as consistent with the view that either subjective bad faith or

objective futility provides a sufficient basis for dismissal of a bankruptcy case.[14]  In any event, as

discussed below, even if objective futility is a *sine qua non* of dismissal, the record supports

dismissal in this case.

### 2.   **The C-TC Factors**

In *C-TC*, the Second Circuit outlined eight factors that a bankruptcy court should

consider when determining whether a case was filed in subjective bad faith: (1) "the debtor has

only one asset;" (2) "the debtor has few unsecured creditors whose claims are small in relation to

those of the secured creditors;" (3) "the debtor's one asset is the subject of a foreclosure action as

---

[14] Admittedly, several district and bankruptcy courts in this circuit have construed *Cohoes* as adopting the view
Sapphire espouses.  *See, e.g.*, *Squires Motel*, 426 B.R. at 34 ("To establish bad faith, the movant must satisfy a two-
pronged test by a preponderance of the evidence.  First, the movant must demonstrate the objective futility of the
reorganization process such that at the time of filing there was no reasonable probability that [the debtor] would
eventually emerge from bankruptcy proceedings.  Second, in demonstrating subjective bad faith, the movant must
show that there was no reasonably likelihood that the debtor intended to reorganize." (citing *Cohoes Indus.
Terminal*, 931 F.2d at 227)); *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) ("The
standard in this Circuit is that a bankruptcy petition will be dismissed if **both** objective futility of the reorganization
process **and** subjective bad faith in filing the petition are found." (emphasis in original) (citing *In re RMC Global
Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996), which, in turn, cites
*Cohoes Indus. Terminal*)); *In re 300 Washington Street, LLC*, 528 B.R. 534, 551 (Bankr. E.D.N.Y. 2015) ("Bad
faith warrants dismissal only if both objective futility of the reorganization process *and* subjective bad faith in filing
the petition are found." (emphasis in original) (citing *Kingston Square Assocs.*)).  This view, however, is not
unanimous, *see, e.g.*, *In re East-West Assocs.*, 106 B.R. 767, 772 (S.D.N.Y. 1989) ("The possibility of an effective
reorganization is not dispositive on the question of good faith[.  H]owever, we believe that it does reflect favorably
on the Petitioning Creditors' efforts and motives." (citation omitted)), and also appears to contravene pre-Code
precedent of the Court of Appeals.  *See Banque de Financement, S.A. v. First Nat. Bank of Boston*, 568 F.2d 911,
916-17 (2d Cir. 1977) (treating the absence of "intention to effect rehabilitation" as an independent basis for
dismissal under the bankruptcy court's "inherent power," but concluding that the bankruptcy court's finding that the
debtor never intended to pursue its Chapter Eleven proceeding for purpose of rehabilitation was clearly erroneous).

a result of arrearages or default on the debt;" (4) "the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;" (5) "the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;" (6) "the debtor has little or no cash flow;" (7) "the debtor can't meet current expenses including the payment of personal property and real estate taxes;" and (8) "the debtor has no employees." *C-TC 9th Ave. P'ship*, 113 F.3d at 1311.

It is imperative that, "in evaluating [the *C-TC*] factors, the Court [] not engage in a mechanical counting exercise to determine whether the Debtor filed in bad faith." *In re R&G Props., Inc.*, No. 08-10876, 2009 WL 1076703, *2 (Bankr. Vt. April 16, 2009) (citation and internal quotation marks omitted). Because the factors are a judicial gloss on the statutory provision allowing dismissals for "cause," they must be applied with an eye to determining whether the debtor's filing is consistent with the purposes of the Bankruptcy Code. *In re Comcoach Corp.*, 698 F.2d at 573 ("When interpreting the meaning of Code terms . . ., we are governed by the Code's purposes."); *see also In re Hartford & York LLC*, No. 13-44563-ESS, 2014 WL 985449, *4 (Bankr. E.D.N.Y. March 13, 2014) ("These factors guide courts in considering the question of whether a case has been filed in good faith, and assist courts in assessing the totality of the circumstances."). Focusing on the overall intent of the debtor, rather than a mechanical counting of the individual *C-TC* factors, enables the bankruptcy court to separate the cases that "accompli[h] the objectives of rehabilitation and reorganization" from those that "use [] these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this statutory policy." *In re Victory Constr. Co., Inc.*, 9 B.R. 549, 558 (Bankr. C.D. Cal. 1981).

**C.  The Bankruptcy Court's Finding of Bad Faith Was Not Clearly Erroneous**

As set forth below, I find that the bankruptcy court's finding of subjective bad faith was not clearly erroneous.  Because I conclude that an additional finding of objective futility is not necessary for dismissal, I may affirm the bankruptcy court's order dismissing the case on that basis alone.  In the alternative, even if Second Circuit precedent requires an additional finding of objective futility before dismissing a case, the record supports a determination that Sapphire's reorganization was objectively futile.

**1.  Subjective Bad Faith**

As noted, the bankruptcy court concluded that "it is open to considerable doubt whether the debtor needs to reorganize" and that the debtor was ultimately seeking to "lock McKay out of this court and the state court in an effort to avoid paying a judgment Longman owes to McKay for Longman's affirmative fraud."  (Bankr. ECF No. 222, at 7–8.)  That conclusion finds ample support in the record.  At the time it filed for bankruptcy protection, Sapphire had not employed a single person in almost a decade, it had no income except from entities also owned by the Trust or controlled by Longman, it had not paid taxes on the Property (its sole asset), and its secured creditors were not threatening to foreclose.  The only recent change in circumstances at the time of Sapphire's bankruptcy filing was that trial was about to begin in the State Court Action.  The bankruptcy court put all this succinctly during the Motion to Abstain hearings: "Sapphire files a Chapter 11 with no property except for the residence.  No employees, no income, having paid no income taxes, and has done nothing except filed not for these four unsecured creditors, but really to file -- to stop Mr. Mckay."  (July 24, 2013 Transcript at 137.)

Application of the *C-TC* factors only confirms that Sapphire's intent in filing had nothing to do with the equitable purposes of the bankruptcy laws.  Factors One, Five, Six, Seven, and

Eight indisputably weigh in favor of a finding of subjective bad faith.  The Property is Sapphire's only asset, Sapphire has little cash flow (the source of which is Lurie, a Longman-controlled entity under no obligation to contribute to Sapphire), its property tax obligations are in arrears in the amount of $281,849.61, and it has not had any employees since 2007.  There was no need for a "fresh start" to reorganize the business because, as the bankruptcy court noted, Sapphire "conducts no business."  (Bankr. ECF No. 222, at 7.)  And the timing of the filing – Factor Five – plainly supported the bad faith finding: Sapphire waited until the lawyers were polishing their opening statements in the State Court Action, which sought a judgment that would have stripped it of its sole asset, before pulling the bankruptcy trigger.  Further, nothing in the record suggests that there were any other circumstances at the time that warranted filing for reorganization or otherwise explained Sapphire's sudden decision to seek bankruptcy protection: Sapphire had been dormant, it had no employees, and none of its secured creditors was threatening to foreclose.  *See In re 15375 Memorial Corp.*, 589 F.3d 605, 626 (3d Cir. 2009) ("Given this mix of facts and the Debtor's sudden decision to file for bankruptcy despite their having been dormant and without employees or offices for several years, we cannot escape the conclusion that the filings were a litigation tactic.").[15]

        In addressing Factor Two, the bankruptcy court stated that there "are few and *de minimis* unsecured claims in comparison to the claim of Sapphire's creditors, and potentially, McKay."

---

[15] Sapphire argues that its bankruptcy filing does not prevent McKay from seeking enforcement of his New York judgment against Longman personally.  This misses the point of McKay's claim in the State Court Action.  McKay seeks to reach the Property, currently held in Sapphire's name, as Longman's asset precisely because of Longman's apparently successful efforts to keep substantial assets out of his own hands (except for a short time in 2007, when he briefly became owner of the Property) since the New York Judgment was rendered.  According to McKay, Longman's strategy of placing assets in the names of other entities has enabled him to resist enforcement of the New York judgment.  Because Sapphire claims to own the Property and because the automatic stay impairs all claims against that asset, the bankruptcy case hinders McKay's ability to enforce his judgment against Longman by shielding what may be the only significant asset Longman has held in his own name (for a short time) in the recent past.

(Bankr. Decision at 8.)  According to its Summary of Schedules, Sapphire is subject to $27,398 in unsecured claims.  (Bankr. ECF No. 36, at 9-10, amended by Bankr. ECF Nos. 73, 75, 84, 132.)[16]  This amount is eclipsed by the approximately $6 million in secured claims listed in the same document.  (Bankr. ECF No. 36, at 6, amended by Bankr. ECF Nos. 73, 75, 84, 132.)

Sapphire asserts that the bankruptcy court should have treated McKay as an unsecured creditor.  (Sapphire Br. 47.)  If Sapphire is correct on this point, McKay's multi-million dollar claim would dramatically increase the amount of unsecured claims and would, when interest on the 1996 judgment is taken into account, tip the second factor against a finding of bad faith.  Yet while McKay may be a "creditor" of the estate within the broad meaning of the bankruptcy code, *see Sapphire Dev.*, 523 B.R. at 5, he should not be considered a creditor for purposes of this analysis.  In ordinary parlance, McKay is a judgment creditor of Longman, who seeks to demonstrate that Sapphire has no property, has no legal existence separate from Longman, and is in no position to invoke the protection of the bankruptcy court's equitable powers at all.  Further, when considered in light of the purposes of bankruptcy, McKay's claim to the Property does not fit as an "unsecured" claim under Factor Two.  The reason Factor Two examines the possibility of an imbalance between secured and unsecured claims is that, if the former heavily outweigh the latter, the creditors as a whole are likely no better off in bankruptcy court.  Creditors holding security interests can generally protect themselves effectively outside of bankruptcy; indeed, the filing of bankruptcy often frustrates their efforts to foreclose on their interests.

On the other hand, unsecured creditors may have greater need for bankruptcy protection if they are to have some chance of recovering some portion of their claims, and thus the presence of substantial claims by unsecured creditors may weigh against dismissal of a bankruptcy case.

---

[16] During the motion to dismiss hearing, Sapphire also offered evidence of an unsecured IRS claim of $1,486.90.  (Sapphire's Mtn. to Dismiss Hearing Ex. 5.)  It also offered evidence of a secured $155,579 claim by the Town of Ridgefield.  (Sapphire's Mtn. to Dismiss Hearing Ex. 4.)

But McKay, who has filed no claim in the bankruptcy, does not seek the protection for unsecured creditors contemplated by Factor Two.  It would thus make no sense to add his claim against Longman to the unsecured side of the ledger under Factor Two, thereby effectively tipping that factor *against* his interests.  Without considering McKay's claim against Longman, the unsecured claims are dwarfed by the secured claims, suggesting bankruptcy proceedings will not better the creditors' overall interests.

Relatedly, Sapphire argues that the creditors who are not named in the State Court Action would be harmed by dismissal, and Hudson City makes the same point in its brief.  But the record belies this argument.  As suggested by its status as the only creditor to oppose dismissal of the bankruptcy, Hudson City – which is named in the State Court Action – is the only creditor that would be harmed if McKay succeeded in that action.  And that harm would be limited to the loss of a tactical advantage, namely, that McKay would have to re-start his fraudulent transfer and other claims in bankruptcy court, rather than pursue them in his chosen forum.  There is no evidence in the record that Hudson will be less able to defend its interests in the State Court Action.  As for the other two large secured creditors, as noted above, J.P. Morgan would benefit from McKay's success in the State Court Action, and the Savings Bank of Danbury supported McKay's motion for abstention.  (Bankr. ECF No. 208, at 2; *see supra* note 4.)  With respect to the remaining secured creditor, the Town of Ridgefield, it would suffer no harm from dismissal of the bankruptcy because its lien will not be extinguished even if the Property is determined to belong to Longman rather than Sapphire.  *See* Conn. Gen. Stat. § 12-172 ("Such lien . . . shall take precedence of all transfers and encumbrances in any manner affecting such interest in such item, or any part of it. . . . No sale of real estate for taxes or foreclosure of any lien shall divest

the estate sold of any existing lien for other taxes.").[17]  Finally, with respect to the unsecured creditors, Longman is listed as a co-debtor in all unsecured claims.  (Bankr. ECF No. 36, at 12.)  Thus, if there is a judgment in the State Court Action determining that the Property belongs to Longman, they could still seek enforcement of their interests.

The bankruptcy court did not expressly address Factor Three, which asks whether "the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt."  In reiterating its findings from the abstention hearing, however, it did note that Sapphire "has been making monthly mortgage payments to the first mortgagee, Hudson [City], and there are no foreclosure actions pending against it."  (Bankr. Decision at 8 (citation omitted).)  McKay concedes that at the time of the bankruptcy court's decision, Sapphire was not facing a foreclosure action.[18]  But this factor does not weigh heavily against dismissal.  The reason Factor Three focuses on pending foreclosure is that such a scenario suggests that the filer's only intent in seeking bankruptcy protection was to stall the foreclosure.  Evidence of virtually the same intent is supplied by a different, yet similar, circumstance in this case: as noted, the timing of Sapphire's bankruptcy filing strongly suggests that Sapphire was using the bankruptcy laws as a litigation tactic to stall the State Court Action, which threatened, in effect, to divest it of its sole asset.

McKay concedes that Factor Four does not favor dismissal because this is not a two-party dispute between the debtor and secured creditors; as noted, Sapphire listed unsecured creditors in the bankruptcy as well.  But this factor does not weigh heavily against dismissal either, for two

---

[17] The Court notes that it was thus mistaken to assert, in its previous ruling, that the Town of Ridgefield had "much to gain" by maintaining the bankruptcy.  *Sapphire Dev.*, 523 B.R. at 10.

[18] McKay points to the portion of Longman's testimony in which he could not prove that he had made appropriate mortgage payments to Hudson City.  As a result, McKay argues that Hudson City *should* have foreclosed on Sapphire's debt.  Sapphire responds that McKay's attempt to "dictate" Hudson City's business decisions is not evidence of foreclosure.  I agree with Sapphire that this factor only applies to actual, and not potential, foreclosures.

reasons.  First, as noted, the value of the unsecured creditors' claims makes them bit players in this drama.  Second, to the extent Factor Four is meant to consider whether there is a need to invoke the bankruptcy laws to protect unsecured creditors, the unsecured creditors in this case will not be significantly prejudiced if McKay succeeds in obtaining a judgment declaring Longman the owner of the Property because Longman is a co-debtor on the unsecured claims.

It is true, as Sapphire suggests, that a debtor's seeking to stall the claims of creditors is not by itself an indication of bad faith, and many legitimate bankruptcies are filed just as creditors are beginning to breathe down the debtor's neck.  *See, e.g.*, *In re Kerr*, 908 F.2d 400, 404 (8th Cir. 1990) ("Determining bad faith . . . requires a difficult distinction between permissible and impermissible motives.  Debtors often wish to shelter whatever assets they can form their creditors, and the Bankruptcy Code permits them to do so.").  But what makes those bankruptcies legitimate is that the debtor and/or one or more its creditors actually need the protection of the bankruptcy laws.  As shown above, the totality of the circumstances here provides ample support for the bankruptcy court's conclusion that there was no such need here, and that the sole motivation for the filing was to stop the State Court Action in its tracks.

After reviewing the record, I cannot say that I am left with the definite and firm conviction that the bankruptcy court's finding of subjective bad faith was a mistake.  The bankruptcy court's finding of subjective bad faith was thus not clear error.

### 2.  Objective Futility

To the extent Second Circuit precedent requires a finding of objective futility in order to dismiss for bad faith, the bankruptcy court's factual findings – none of which are clearly erroneous – support the conclusion that Sapphire's reorganization would have been objectively futile.  While the bankruptcy court did not use the words "objective futility" in its decision, it did

analyze the evidence in the record relevant to this question and found reorganization to be
unlikely.  That is sufficient to permit this Court to affirm.  *See, e.g.*, *In re Weil*, No. 3:12-cv-462
(SRU), 2013 WL 1798898 (D. Conn. April 29, 2013) (affirming bankruptcy court's order in
substantial part "on other grounds").

The bankruptcy court made the following findings related to Sapphire's chances of
reorganizing:

> Although Sapphire's Chapter 11 case hinges on filing a confirmable plan of
> reorganization, the core of which is the subdivision of the Property, Sapphire
> cannot accomplish that goal without zoning approval from the Town of
> Ridgefield, which is has neither sought nor obtained.  Sapphire did not
> persuasively dispute any of that evidence.
>
> Sapphire's opposition to the Motion to Dismiss primarily centered on the value of
> the Property and its intention to subdivide, develop, and sell a portion of the
> Property to fund its plan, utilizing a plan-funding agreement with a Longman-
> Controlled Entity.  The balance of the Property would remain as Longman's
> residence with Longman paying rent to Sapphire.
>
> Having reviewed the evidence and assessed the credibility of the witnesses, the
> Court finds that McKay's evidence debunked Sapphire's subdivision scheme,
> which was the alleged basis for the commencement of this Chapter 11 case and
> the proposal of its plan of reorganization.

(Bankr. Decision at 8–9 (footnote omitted).)  These findings were based, in part, on the
bankruptcy court's finding that Longman's credibility was "questionable, at best."  (*Id.* at 9 n.6.)
This credibility determination carries significant weight; I must defer to the bankruptcy court's
credibility determinations based on in-court testimony.  *See In re Ciena Capital LLC*, 440 B.R.
47, 52 (S.D.N.Y. 2010) ("In reviewing the findings for clear error, [the appellate court is] not
allowed to second-guess [] the trial court's credibility assessments . . .")

Absent Longman's testimony, the record contained no evidence that Sapphire was likely
to emerge successfully from bankruptcy.  To succeed in selling parts of the Property, Sapphire
would have to obtain formal approval of a subdivision plan from the Commission.  The only

evidence in the record that this was likely to occur was Longman's own testimony.  Brosius, the Commission witness, stated that no formal application had been filed yet, and that Longman's "pre-submission concept" presentation yielded no binding decisions.  As she explained, "[t]he Connecticut statutes allow any applicant who is potentially coming in front of the [C]omission . . . to meet informally with the [Commission] to describe that project and *there are no binding decisions made at that time*."  (April 14, 2015 Transcript at 18 (emphasis added).)  Longman provided the only testimony that a formal presentation would be made.  (*See* April 16, 2015 Transcript at 26 ("Q. Could you tell why [you] have not proceeded with the subdivisions after you had that meeting [with the Commission?]  A. It is my understanding that I have not -- that I do not have the power to continue until the bankruptcy court gives me that authorization.  Q. And should this court deny Mr. McKay's motion to dismiss and allow this bankruptcy court to proceed, is it your intent to expeditiously proceed with th[ose] subdivisions?  A. Yes, it could be done very quickly.").)  After rejecting Longman's testimony, the bankruptcy court was left with no evidence suggesting that the subdivision plan would proceed or win the Commission's approval.

Sapphire points out that the bankruptcy court rejected Longman's testimony on the ground that other courts had found him not to be credible in unrelated contexts, which is in part correct.  (*See* Bankr. Decision at 9 n.6.)  But that was not the sole ground for the bankruptcy court's credibility finding; it was also based on Longman's testimony at the hearings on the motion to abstain and the motion to dismiss.  In that testimony, Longman admitted that he signed a filing, under oath, containing false information regarding the source of Sapphire's income.  (April 14, 2015 Transcript at 58–59.)  Longman also told Hudson City when signing the mortgage documents that no judgments were pending against him, despite the fact that he was a

27

multi-million dollar judgment debtor at the time.  (July 24, 2013 Transcript at 25).  Further, Longman testified that he had sent Hudson City a check for over $100,000, and no party at the hearing was able to produce evidence of such a payment.  (April 14, 2015 Transcript at 54–55; April 16, 2015 Transcript at 36–41.)  Even without the conclusions reached by other courts, there was ample evidence to support the bankruptcy court's finding that Longman was not credible.

Sapphire also argues that the bankruptcy court improperly relied on Sapphire's failure to submit a formal subdivision plan to the Commission.  Longman testified that Sapphire had not submitted such a plan because he was under the impression that Sapphire had to obtain the bankruptcy court's permission before doing so.  (April 14, 2015 Transcript at 60; Sapphire Br. 40–41.)  Again, however, the bankruptcy court did not find Longman to be a credible witness, and it was thus not required to accept the notion that Longman's impression about the law was the true reason Sapphire failed to file a plan.  This makes Sapphire's legal argument about whether Longman's impression was consistent with the bankruptcy code beside the point.[19]

In order to assist Sapphire in emerging from bankruptcy, the subdivision plan must also improve the value of the Property.  The record does not support a finding that the subdivision plan would achieve this goal, and the bankruptcy court's finding that it would not was not clearly erroneous.  One of the appraisals obtained by Sapphire, performed by a MAI appraiser, indicated that the Property's value would not increase materially if subdivided.  Another, by a non-MAI appraiser, indicated that the value of the Property had increased by 17 percent since earlier

---

[19] Sapphire's legal argument is not convincing in any event.  Sapphire argues that, because subdividing and selling parts of the Property is not within the debtor's "ordinary course of business," it had to seek court approval under 11 U.S.C. § 363(b).  Section 363(b) states that "[t]he trustee [which may be a debtor-in-possession in a Chapter 11 case], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  While Sapphire is correct that sale of the Property would have been a "sale" outside its ordinary course of business, inasmuch as it had no business at the time of filing, taking steps preliminary to a sale would not be.  Filing a subdivision plan and seeking approval by the Commission – without more – would not have constituted "use," "sale," or "lease" of the Property.  Although a Commission witness testified at the hearings, Sapphire presented no evidence that filing a subdivision plan would have somehow irrevocably committed Sapphire to using, selling, or leasing the property in a particular way.

appraisals, but did not provide a comparison between the value for the property as-is and the value as subdivided.  (April 16, 2015 Transcript at 29–30.)  Thus, there is no evidence in the record that subdivision would improve materially the Property's value.

Because there was no evidence in the record that the bankruptcy court found credible suggesting that the subdivision plan would win Commission approval or improve the value of the Property, the bankruptcy court's findings were not clearly erroneous.  Those findings also support the conclusion that Sapphire's reorganization was objectively futile.

### D.  The Bankruptcy Court Did Not Err In Dismissing the Case After Finding Cause

While neither appellant argues that the bankruptcy court erred by dismissing the case rather than converting the case to Chapter 7, and no party sought conversion before the bankruptcy court, I note that this choice was not error.  Once cause is shown under Section 1112(b)(1), a bankruptcy court must choose between conversion and dismissal, "whichever is in the best interests of creditors and the estate."  11 U.S.C. § 1112(b)(1).  I review the bankruptcy court's decision to dismiss rather than convert the case for abuse of discretion.  *See, e.g.*, *In re Hampton Hotel Investors, LP*, 270 B.R. 346, 359 (Bankr. S.D.N.Y. 2001) ("Courts agree that ultimately, the determination of whether to dismiss a chapter 11 case, on the one hand, or to convert, on the other, is a matter for sound judicial discretion.").

The bankruptcy court found that Sapphire would not be better served by conversion because conversion would dispossess Sapphire of the Property.  (Bankr. Decision at 11.)  It also found that the interests of the creditors would be affected identically by dismissal or conversion because the unsecured creditors' claims listed Longman as a co-debtor.  (*Id.*)  Finally, the bankruptcy court found that conversion would have the effect of continuing Sapphire's bad faith filing to McKay's detriment.  (*Id.* at 11–12.)  The evidence in the record supports the bankruptcy

court's findings.  I cannot say that its choice of dismissal over conversion was an abuse of discretion.

Both Sapphire and Hudson assert that even if McKay satisfied his burden of showing bad faith, the bankruptcy court should not have dismissed this case because it fell under the exception set forth in 11 U.S.C. § 1112(b)(2), which states,

> The court may not . . . dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that . . . dismissing the case is not in the best interests of creditors and the estate, **and** the debtor or any other party in interests establishes that (A) there is a reasonable likelihood that a plan will be confirmed within . . . a reasonable period of time; and (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than [substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation] (i) for which there exists a reasonable justification for the act or omission; and (ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2) (emphasis added).  Sapphire's argument on this point is not entirely clear, but Hudson City argues that this exception applies on the ground that dismissal was not in the best interests of the creditors and the estate because not all the creditors are parties in the State Court Action.  As shown above, the notion that any creditors other than Hudson City will be harmed by dismissal does not withstand scrutiny, and Hudson City is in a position to protect its interests in the State Court Action.  But in any event, there are other reasons the exception set forth in subsection (b)(2) does not apply here.  First, contrary to Hudson's argument, the requirements of the exception are conjunctive, not disjunctive: the plain language quoted above makes clear that the party asserting application of the exception must demonstrate the existence of *all* of the listed conditions.

Hudson and Sapphire do not address most of the other conditions in their briefs: neither suggests that the bankruptcy court found or "specifically identifie[d]" any unusual circumstances; neither has shown, under all the circumstances, that there was a "reasonable

justification" for the debtor's filing bankruptcy on the eve of the state court trial, let alone how that act could be "cured"; and neither has shown that the bankruptcy court's findings supporting futility are clearly erroneous – including its finding, expressly rejecting application of this exception, that "Sapphire's proposed Property subdivision assumes . . . it will be permitted to subdivide the Property, despite admitting it has not sought any of the requisite zoning approval from the Town of Ridgefield."  (Bankr. Decision at 12.)   The latter finding forecloses Hudson and Sapphire from satisfying the requirement of Section 1112(b) that there be a "reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time."  The bankruptcy court did not err in finding that the Section 1112(b)(2) exception does not apply.[20]

### Conclusion

For the reasons stated above, the bankruptcy court did not clearly err in its finding that Sapphire filed for bankruptcy protection in bad faith, and did not err in finding that the exception to dismissal set forth in 11 U.S.C. § 1112(b)(2) was inapplicable.  I AFFIRM the bankruptcy court's order granting the motion to dismiss.  The Clerk is instructed to close this case.


IT IS SO ORDERED.


 /s/ 
Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              February 1, 2016

---

[20] The bankruptcy court also rejected Section 1112(b)(2)'s applicability because Sapphire's subdivision plan assumed "the conclusion that it is the rightful owner of the Property."  (*Id.*)  Sapphire contends that this was error because "there is no question that the Property is property of the Debtor's estate as a matter of statutory law." (Sapphire Br. 54.)  While I agree with Sapphire that the Property is subject to the bankruptcy court's jurisdiction and that Sapphire demonstrated clear record title to the Property, the bankruptcy court's reasoning, if error, was not material.